# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2558 | **DATE** | 3/28/2003 |
| **CASE TITLE** | NIKI DEVELOPMENT CORP., et al vs. HOB HOTEL CHICAGO PARTNERS, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants HOB Hotel Chicago Partners, L.P., HOB Marina City Partners, L.P. HOB Hotel Chicago, Inc., and HOB Marina City Inc.'s motion for summary judgment is granted and Defendant HOB Entertainment Inc.'s motion for summary judgment is granted. [80-1,81-1]. This case is hereby terminated. This is a final and appealable order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | 106 |
| | Notified counsel by telephone. | MAR 31 2003 date docketed | |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| CG | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NIKI DEVELOPMENT CORP., )
an Illinois Corporation, MARKS )
THEATRE INVESTMENT, LLC )
an Illinois Limited Liability Comp,)
MARKS IV REALTY, INC. )
an Illinois Corporation, MARKS )
HOTEL INVESTMENTS, LLC, )
an Illinois Liability Comp., on )
behalf of HOB Hotel Chicago )
Partners, L.P. a Delaware limited )
partnership, and JOHN MARKS, )
    Plaintiffs, ) No. 00 C 2558
        )
   v.    ) Judge Ronald A. Guzman
        )
HOB HOTEL CHICAGO )
PARTNERS, L.P. a Delaware )
Limited Partnership, HOB )
MARINA CITY PARTNERS, )
L.P., a Delaware limited )
Partnership, HOB HOTEL )
CHICAGO, INC., a Delaware )
Corporation, HOB MARINA )
CITY, INC., a Delaware )
Corporation, HOB )
ENTERTAINMENT, INC. )
a Delaware corporation, )
HOB CHICAGO, )
INC., and JEFFREY C. LAPIN, )
        )
    Defendants. )

DOCKETED

MAR 3 1 2003

## MEMORANDUM OPINION AND ORDER

Before this Court are Defendants HOB Hotel Chicago Partners, L.P., HOB Marina City

Partners, L.P., HOB Hotel Chicago, Inc., HOB Marina City, Inc. and HOB Chicago, Inc,'s joint

1



motion for summary judgment as to Counts I, II and III of Plaintiffs' Niki Development Corp.,

Marks Theatre Investment, L.L.C., Mark IV Realty, Inc., Marks Hotel Investments, LLC and John

Marks' first amended complaint. Also pending is Defendant HOB Entertainment, Inc.'s motion

for summary judgment as to Count IV. For the reasons set forth below Defendants' motions for

summary judgment are granted.

## BACKGROUND FACTS

Plaintiffs Niki Development, Marks Theatre L.L.C., Mark IV Realty, Inc. and Marks

Hotels L.L.C ("hereinafter referred to as Plaintiffs) are investment and business vehicles of

Plaintiff John Marks and members of the Marks family. In November of 1994, Plaintiff Niki

Development (owned by Plaintiff John Marks ("Marks") and other family members) purchased

portions of the Marina City complex from bankruptcy for $3,000,000 (Defendants' 56.1 Statement

¶ 13). At that time, the Marina City complex consisted of a movie theatre, retail space, an office

building, and a parking garage in the lower floors of the twin condominium towers (Defendants'

56.1 Statement ¶ 14). The condominium portion of the towers was and still is owned and

operated by the homeowners, and is not involved in this dispute (Id.).


## I. The Theatre Limited Partnership

Sometime in 1995, Marks and his company Niki Development entered into negotiations

with HOB Entertainment, Inc. ("HOB Entertainment"), a Delaware corporation located in

California, and the parent company of the House of Blues nightclub. The purpose of these

negotiations was to open a theatre club in the old (to be rehabbed) movie theatre building at

Marina City (Defendants' 56.1 Statement ¶ 15). During negotiations over the Theatre Limited

Partnership Agreement, and on "various occasions" thereafter, Marks requested the opportunity to purchase "a million dollars worth of stock" in HOB Entertainment on the belief that the company would some day "go public."( Ex. 4 Marks Dep., pp. 117-19).

In January of 1996, Marks, Niki Development and HOB Entertainment reached an agreement for the redevelopment of the theatre building into a House of Blues nightclub. (Defendants' 56.1 Statement ¶ 16). The Marina City property was then subdivided so the theatre building occupied a separate parcel of the property. (Defendants' 56.1 Statement ¶ 17). Niki Development then conveyed the theatre to a limited partnership, HOB Marina City Partners, L.P. ("Theatre Limited Partnership"), which owns the property, and leases the theatre property to HOB Chicago, Inc. (the Theatre General Partner) for operation of a House of Blues club. (Defendants' 56.1 ¶ 18).

In return for conveyance of the real property, Niki Development (now Marks Theatre Investment, LLC) was deemed to have contributed $5,000,000 to the Theatre Limited Partnership (the other partners contributed cash) and Niki Development/ Marks Theatre Investment, LLC received a 35% limited partnership interest in the Theatre Limited Partnership (Defendants' 56.1 Statement ¶ 19). Platinum Blues Chicago, L.L.C. ("Platinum") and HOB Chicago, Inc. were the other two limited partners. (Plaintiffs' 56.1 Statement ¶ 9, Exhibit A to Plaintiffs' complaint, page 1).

The Theatre Limited Partnership Agreement provided, among other things, that in the event that HOB Entertainment, its parent company, sold all or substantially all of its assets, completed an IPO, or transferred its voting control to a third party, "Niki Development, now Marks Theatre L.L.C." and Platinum shall, together and not independently, have ninety (90)

3

days...to exercise the right to put [i.e. sell back] their respective Limited Partnership interests to the General Partner" at a fixed amount equal to their initial capital contribution, as adjusted, plus interest at the greater of 12% per year or 36% in total. (Ex. 1, Theatre Limited Partnership Agreement, pp.37-28, § 12.1). The Theatre Limited Partnership was to continue until September 30, 2045 and this agreement is governed by the laws of Delaware (Plaintiff's Complaint, Exhibit A, § 11.2). In the Spring of 1996, Marks purchased HOB stock valued at $300,000 based upon the HOB "concept and people." (Marks' Tr. p.29).

Subsequent to the closing of the theatre transaction, HOB Entertainment and Marks discussed the remainder of the commercial property at Marina City. (Defendants' 56.1 Statement ¶21). Marks wanted to convert the vacant office building into a Hilton Gardens Hotel (Defendants' 56.1 Statement ¶22) and HOB Entertainment was interested in extending its brand name to a House of Blues-themed hotel (Defendants' 56.1 Statement ¶ 23). To no one's surprise the House of Blues hotel concept won out over Marks's proposed Hilton Garden concept.

## II. First Amendment to the Theatre Limited Partnership

In August 1996, Marks and the Theatre General Partner–HOB Marina, Inc. (Plaintiffs' Complaint, Exhibit 2, page 1) began to discuss a proposed First Amendment to the Theatre Limited Partnership Agreement (Defendants' 56.1 Statement ¶ 31). It is undisputed that Marks had been informed in the Fall of 1996 that large losses had occurred at the Atlanta House of Blues Club during the 1996 Summer Olympics. (Ex. 4 Marks Dep. pp. 229-232, 234). Marks was also aware that substantial losses had occurred during the construction of the theatre (Ex. 4 Marks Dep. p 230).

On August 16, 1996, counsel for the Theatre General Partner, HOB Marina City, Inc., sent a draft of the proposed First Amendment to Marks' counsel (Defendants 56.1 Statement ¶ 32). The draft indicated that only Niki Development and not Platinum, would be giving up its option or "put" right, pursuant to Section 12.1 of the Partnership Agreement. (Defendants' 56.1 Statement ¶ 32).

In October of 1996, it is undisputed that both Isaac Tigrett, HOB's Entertainment's CEO and Eric Levine, a close advisor of Tigrett's, told Marks that HOB Entertainment needed to refinance the Club because of high construction costs, and that they needed to make changes in the Theatre Partnership Agreement because of the "put" provisions (Plaintiffs' 56.1 Statement ¶ 155). It is undisputed that HOB was negotiating for additional financing with a lender, Sun America Investment, Inc. The limited partners "puts" provisions made the investment opportunity less desirable to a lender such as Sun America.

On December 12, 1996, the Theatre General Partner sent Marks a draft of the First Amendment to the Theatre Limited Partnership Agreement (Defendants' Exhibit 9). It is undisputed that the Theatre draft on its face indicated in paragraph 4 that Platinum was not relinquishing its put right. (Defendants' Exhibit 9).

On December 19, 1996, HOB Entertainment's attorney sent to Mark's attorney by telecopy and overnight messenger (1) a Stock Purchase Agreement, in which HOB Entertainment agreed to sell 1,000,000 shares of preferred stock in HOB Entertainment at $3.00 per share to Marks; and (2) "the most recent draft of the Form S-1 Registration Statement' for HOB Entertainment. (Defendants' 56.1 Statement ¶ 42). It is undisputed that this S-1 draft identified losses from HOB Entertainment's operations, including those incurred at the Atlanta HOB's Club during the 1996

5

Summer Olympics. (Defendants' 56.1 ¶46).

The draft SEC S-1 Disclosure Statement sent to Marks' attorney on December 19, 1996 provided that "Mr. Tigrett developed the House of Blues concept, and along with Mr. Akroyd's assistance in promoting the brand, has been essential to the successful growth of the concept to date. The loss of the services of Mr. Tigrett, Mr. Trojan, or Mr. Akroyd could have a material adverse effect upon the Company's business, financial condition or result of operations." (Plaintiffs 56.1 Statement ¶ 81). The letter enclosing the documents specifically advised Plaintiff that: [o]f course, there can be no assurance that a public offering of the Common Stock of HOB Entertainment, Inc. will occur (Defendants' 56.1 Statement ¶43).

In addition, the December 19, 1996 letter specifically advised Marks that:

"since August 1996 representatives of DLJ, the lead managing underwriter, Montgomery Securities, Smith Barney, and Dain Bosworth have been working diligently on the Initial Public Offering of the Common Stock of HOB Entertainment, Inc. and committed to the process. You can confirm this commitment by contacting Marc Dien of DLJ, whose direct number is (310) 282-5063. Of course, there can be no assurance that a public offering of the Common Stock of HOB Entertainment, Inc. will occur."

(Defendants' Exhibit 10).

In the draft Stock Purchase Agreement sent to Marks on December 19, in connection with Marks purchase of HOB Entertainment stock, Marks was also called upon to represent and warrant to HOB Entertainment that he:

"has been furnished access to the business records of the Company and such additional information and documents as [he] requested and has been afforded an opportunity to ask questions of and receive information from representatives of the Company concerning the terms and conditions of this Agreement, the purchase of the [stock], the Company's business, operations, market potential, capitalization, financial conditions and prospects, and all of the matters deemed relevant by [Marks]..."

6

(Defendants' Exhibit 10).

The draft Form S-1 that HOB Entertainment sent to Marks contained a lengthy discussion of the business and financial condition of HOB Entertainment and specifically identified the losses from its operation, including those incurred at the Atlanta Club (Defendants' 56.1 ¶ 46) Marks understood at all times that consummation of an IPO was not guaranteed. (Ex. 4 Marks Dep. pp. 133-34 12/12/96 letter).

The letter further stated that, "if the draft documents were acceptable, then the First Amendment to the Theatre Limited Partnership Agreement, and the Stock Purchase Agreement would be executed concurrently." (Id). It is undisputed that neither Marks nor his attorneys called anyone to inquire about the status of the IPO following the receipt of the December 19, 1996 letter. (Defendants' 56.1 Statement ¶ 44).

On December 24, 1996, Marks executed and delivered to the Theatre General Partner the signed First Amendment to the Theatre Limited Partnership Agreement. (Defendants' 56.1 Statement ¶ 49). Section 12.1 of the Amended Partnership Agreement specifically provided the following; [the option to sell or put a limited partner's interest] is hereby modified to delete any and all references therein to Marks and/or Niki, so that Section 12.1 shall only apply to Platinum, and Marks hereby waives and releases any and all rights it had under the Partnership Agreement to put its Limited Partnership Interest to the General Partner (Defendants' 56.1 Statement ¶ 50).

The First Amended Partnership Agreement also provided that one of the limited partner's contributions to capital was increased from $1,880,000 to $6,3000,000 and the Theatre General Partner's contribution was increased from $120,000 to $700,000; but Niki Development's

7

contribution remained the same (Defendants' 56.1 Statement ¶ 51). On or about the same date Marks executed a Stock Purchase Agreement which committed Marks to purchase, and HOB Entertainment to sell 1,000,000 shares of HOB Entertainment preferred stock (Defendants' 56.1 Statement ¶ 52). Marks paid a portion of the purchase price for the stock on January 17, 1997 and the remainder six months later. (Defendants' 56.1 Statement ¶54).

### III. Hotel Limited Partnerships

In December of 1996, Marks (Niki Development) decided to sell the commercial property to a newly formed limited liability company, Marina City Hotel Enterprises, L.L.C. ("MCHE"), to be owned 56% by Nomura and 44% by a newly created limited partnership HOB Hotel Chicago Partner, Inc. MCHE owns the entire House of Blues Hotel and retail complex. (Ex. 17, ) Operating Agreement p. 16-17, § 1.1.91). Mark's sale of the commercial property (exclusive of the theatre property) to MCHE closed in January, 1997 (Defendants' 56.1 Statement ¶ 60).

HOB Hotel Chicago, Inc. was the General Partner, Marks Hotel Investment, LLC a limited partner and House of Blues Hospitality, Inc. a limited partner. The purpose of the hotel partnership was to acquire and to own a membership interest in MCHE the Operating Company . (Plaintiff's Complaint Exhibit C. page 5, Section 2.5). It is undisputed that Nomura as the majority owner of MCHE (owning 56% of the limited liability company as a result of a multi-million dollar loan made to finance the development) controlled the budgets, schedules, and spending with respect to hotel construction, development, and operations (Defendants' 56.1 Statement ¶ 76). As part of that initial transaction, Marks received $6.2 million in cash, an additional $1.5 million during 1997, and various other benefits, including assumption of Marks' financial obligations by MCHE (Defendants' 56.1 Statement ¶ 61). Marks also received a 46%

8

interest in the Hotel Limited Partnership which as noted above, owns a 44% interest in MCHE (Defendants 56.1 Statement ¶ 66).

On January 16, 1997 the Hotel General Partner ( HOB Hotel Chicago Partner) entered into an Operating Agreement with Partnership Acquisition Trust VIII ("the NACC Member-Nomura) for the development, operation and general management of the Hotel. The contract was signed by Jeff Lapin as President of HOB Hotel Chicago Partners and David Murdoch as an authorized signatory of Partnership Acquisition Trust, VIII. Nomura also was a signatory to the Operating Agreement. (Defendants' Exhibit 2, Operating Agreement, page 99).

Article 5 of the Operating Agreement set out the details for management of the company. Under the Operating Agreement, MCHE was governed by a two-person board of managers. One of the managers was appointed by Nomura and the other was appointed by the Hotel Limited Partnership (Defendants' 56.1 Statement ¶ 78). Jeff Lapin ("Lapin") had been hired by Tigrett in June 1996 to join HOB Entertainment Inc, as Executive Vice President, and was responsible for advising HOB Entertainment, Inc. on the development of the hotel. (Tigrett Dep. Tr. 53). Lapin was also was president of HOB Hospitality, Inc. one of the two limited partners of the Hotel Partnership (Fishkin Tr. 24). HOB Hospitality is a division of HOB Entertainment. HOB Entertainment owned 80% HOB Hospitality and Lapin 20%. David Murdoch ("Murdoch") was the manager appointed by Nomura (Defendants' 56.1 Statement ¶ 79).

Sections 5.2 and 5.3 set forth the powers and duties of the mangers. The Operating Manager had the primary responsibility for overseeing the performance of the company, ensuring sufficient funds were available, engaging contractors, actively pursuing leases, maintaining the books and records of the Company etc. (Exhibit 25, page 51, § 5.2.2). Under the Operating

9

Agreement, there were three types of decisions: (1) ones that the Operating Manager could make on his own; (2) ones that required the concurrence of both managers; and (3) ones that Nomura had the exclusive right to make. The decisions that Nomura had the exclusive right to make were referred to as "NACC Delegated Decisions," and were set forth in Section 5.3.1 of the Operating Agreement (Defendants 56.1 Statement ¶ 80). The Operating Agreement provided that as to NACC Delegated Decisions, "the HOB Members [the Hotel Limited Partnership] hereby unconditionally and irrevocably delegates to the NACC Member, the exclusive right to authorize and make all decisions" concerning such topics (Defendants' 56.1 Statement ¶ 81).

Under the Operating Agreement decisions concerning budgets, selection of general contractor and/or construction manager, financing of the project, approval of the construction schedule, selection and replacement of the manager, leasing of the Hotel were all NACC Delegated Decisions (See Operating Agreement pp 53-55). The MCHE Operating Agreement and the Hotel Limited Partnership Agreement provide for the distribution of revenues by giving priority (after payment of expenses and debt) to Nomura, which funded most of the project, and then to the HOB entities which put cash in the deal, and then to Marks Hotel L.L.C., which took substantial cash out of the project at the front end and received a limited partnership interest in addition (Exhibit 17, Operating Agreement, p. 37-42; Exhibit 19, Hotel Limited Partnership Agreement, pp.11-12 § 4.1).

The construction of the Hotel got off to a "blue" start. It is undisputed that Jeff Lapin was overseeing the day-to day running of the hotel development project, and Marks was not happy with Lapin's management decisions or participation in the project. It is also undisputed that Nomura was involved in the development of the Hotel. This is not surprising in light of the

substantial capital Nomura had loaned to MCHE. Nomura instructed Jeff Lapin shortly after signing of the Operating Agreement, that, during the initial 180-day option period, it would not permit MCHE to sign any leases for commercial space. (Ex. 24, 1/20/97 MCHE/DRI Meeting Minutes p.1, §1.1).

It is also undisputed that David Murdoch and Rob Treleven, two representatives from Nomura, participated in various aspects of the Hotel project, i.e. leasing and budget decisions of MCHE. (Ex. 20 Murdoch Dep., p 83-85; Treleven Dep. p. 78, Lapin Dep. p. 95; Lapin Decl. ¶ 14). Under the Operating Agreement, decisions concerning the leasing of any space in excess of 5,000 square feet were NACC Delegated Decisions (Ex. 17, Operating Agreement, p.53, § 5.3.1(a)) It is also undisputed that Nomura authorized expenditures in excess of the original development budget in order to create a distinctive hotel at Marina City. (Ex. 22, Lapin Dep., p. 141; Ex. 21 Lapin Decl. ¶ 11; Ex. 20, Murdoch Dep., p. 126, 132).

The Hotel project ran into cost overruns and did not open when originally projected to do so. In May of 1997, and March and April 1998, Mark's lawyer, Elias Matsakis, began writing to HOB Entertainment's General Counsel, Daniel Fishkin, raising concerns that Marks had about the redevelopment of the commercial property, and requesting information. (Defendants' 56.1 Statement ¶ 26).  Mr Fishkin provided information to Marks in response to his inquiries. (Defendants' 56.1 Statement ¶ 27).  In late October 1998, Marks met with members of the HOB Entertainment board of directors to explain his concerns about the Marina City redevelopment. (Defendants' 56.1 Statement ¶ 28). These letters from Marks or his attorney did not mention Marks Hotel L.L.C. relinquishment of it put right, Marks purchases of the HOB Entertainment stock, or the failure of HOB Entertainment to go public in the first quarter of 1997. (Ex. 16,

Marks/Matsakis letters; Am. Complaint).

Following that meeting Mr. Fishkin was asked by HOB Entertainment's directors to look into Mark's concerns to determine if they had any merit (Defendants' 56.1 Statement ¶ 29). As part of his investigation, Mr. Fishkin retained an independent consultant named David Worell, and various other parties engaged in leasing, construction and development activities were interviewed (Defendants' 56.1 Statement ¶ 30). HOB Entertainment concluded that Mark's allegations were without merit and that the true facts were not "as were painted by Marks' and his attorney." (Defendants 56.1 Statement ¶ 31).

The House of Blues Hotel finally opened in October of 1998. Two month later Marks purchased 10,000 additional shares of HOB Entertainment preferred stock. (Ex. 4, Marks Dep., pp. 129-130). In August of 2000 HOB Hotel Chicago Partners, L.P. appointed David Worrell as Operating Manager to replace Lapin. The resolution attached to the letter was signed by Gary Trojan, HOB's CEO, who was acting on behalf of the General Partner with respect to the change. (Plaintiffs' Tab 13).

## IV. HOB Entertainment

HOB Entertainment is a multi-dimensional entertainment company that capitalizes on the popularity and universality of music through the development of its House of Blues brand. The company was formed and launched in 1992 by Isaac B. Tigrett who co-founded the Hard Rock Café chain in 1971. In September of 1996 the board of Directors of HOB Entertainment commenced discussions as to its CEO, Isaac Tigrett's role. Tigrett was considered a key person in the development of the House of Blues Entertainment venture, and it is undisputed that HOB Entertainment was struggling with serious financial issues as well as management issues. It is also

12

undisputed that HOB was hoping to go forward with an Initial Public Offering in 1996. Discussion took place as to the possible transfer of Tigrett's responsibilities to Gary Trojan, Chief Operating Officer (Plaintiffs' 56.1 Statement ¶¶51, 52, 53). At a telephone board meeting in September of 1996, Tigrett was voted out as Chairman of the Company (Plaintiff's 56.1 Statement ¶ 69). Tigrett testified at the end of September of 1996 the board had "determined that they were not going to go public on the schedule, but had to wait until the first of the year." (Plaintiffs' 56.1 Statement ¶ 63, Tigrett Tr. 89-90, 92-93). Tigrett testified that "the board "made it clear that one of the reasons that they did not want to go forward with this offering at this time was that they wanted me out of the company." (Id.). Tigrett was severed from the Board in September of 1997 (Tigrett Tr. pp.145-147).

HOB produced a Summary of Financial Data sheet from a Class C Registration Statement that HOB distributed which showed that its loss year through September 30, 1996 was $16,971,000 (Plaintiffs' Tab 23). The draft SEC S-1 Disclosure Statement also provided under the "RISK FACTORS" section that "the Company's development and other activities have depended and in the future will depend on the efforts of its senior management and certain consultants, particularly Isaac B. Tigrett the Company's founder, Chairman of the Board and Chief Executive Officers, Gregory Trojan, President and Chief Operating Officer, and Daniel E. Akroyd, a Director of and consultant to the Company (Plaintiffs' 56.1 Statement ¶ 82). The Board decided in September of 1996 not to go public by year end (Schenker Tr. 76) and to defer any decision on filing a Registration Statement for an initial public offering of the common stock of the Company until a future date." (Tab 16, p.6). On September 24, 1997 Tigrett was voted out as a director and Chairman of the Company (Tigrett Tr. 145, 147).

13

It is undisputed that Marks never attended an HOB board meeting and he was not part of the HOB board of directors (Plaintiffs' 56.1 Statement ¶ 61). In the Spring of 1996, Marks purchased HOB stock valued at $300,000 based upon HOB concept and people. (Plaintiffs' 56.1 Statement ¶ 12). On December 20, 1996, Marks decided to sign a Stock Purchase Agreement to purchase 1,000,000 additional shares of HOB stock because of his close relationship with Tigett, his confidence in Tigrett's ability and power within HOB to develop additional HOB hotels in the future as he planned, and Tigrett's influence with the HOB board (Plaintiffs' 56.1 Statement ¶ 76). According to Marks, he decided to sign a Stock Purchase Agreement to purchase 1,000,000 additional share of HOB stock because of his close relationship with Tigrett, his confidence in Tigrett's ability and power within HOB to develop additional HOB hotels in the future as he planned, and Tigrett's influence with the HOB Board. (Tabl 18, Marks Affidavit ¶6). It is disputed whether Marks would have signed the Stock Purchase Agreement dated December 20, 1996 if Tigrett's possible ouster was disclosed to him at the point in signing (Id.). The House of Blues Hotel finally opened in October of 1998. Two month later Marks purchased 10,000 additional shares of HOB Entertainment preferred stock. (Ex. 4, Marks Dep., pp. 129-130). In August of 2000 HOB Hotel Chicago Partners, L.P. appointed David Worrell as Operating Manager to replace Lapin. The resolution attached to the letter was signed by Gary Trojan, HOB's CEO, who was acting on behalf of the General Partner with respect to the change. (Plaintiffs' Tab 13).

According to Joseph Kaczorowski, Executive Vice President and CFO of HOB, the "same group of officer" are used in all of the corporations controlled by HOB (Kaczorowski Tr. 6,9). Kaczorowski has never seen any corporate minutes of the General Partners for the Hotel, nor of HOB Hospitality. (Id.). Kaczorowski thinks he may be the Treasurer of the General Partner for

14

the hotel, but doesn't recall (Id.).

In the fall of 1999, HOB sold equity securities which transferred voting control of HOB to Chase LLP an unrelated third party, which but for the First Amendment, would have also permitted Marks Theatre Investments, L.L.C. (Niki Development Corp.) to require the general partners HOB Theatre, to purchase its limited partnership interest at the purchase price formula set forth in Article XII of the Theatre Agreement. (First Amendment Complaint ¶ 28).

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits , if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as matter of law." Fed. R. Civ. 65(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it, in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The movant has the burden of establishing that there is no genuine issue of material facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). If the movant satisfies this burden, the non-movant must set forth specific facts which demonstrate the existence of a genuine issue for trial. Fed.R.Civ. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S. Ct. at 2552-53. A scintilla of evidence in support of the non-moving party's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. 242 at 250, 106 S. Ct. 2505, 2511.

## COUNT I

In Count I of Plaintiffs' First Amended complaint (titled Rescission of the First
Amendment) Plaintiff Marks Theatre Investment, L.L.C. seeks an order from this court
rescinding the First Amendment to the Agreement of Limited Partnership of HOB Marina City
Partners, L.P. Plaintiff seeks a declaration that the agreement is null and void. The legal theory
Plaintiff bases his rescission request upon is fraud in the inducement and equitable fraud (See
Count I of Plaintiff's First Amended Complaint).

The material misrepresentations which Plaintiffs allege took place and support the alleged
fraud are incorporated by reference into Count I from paragraphs 19 through 21 of Plaintiffs'
complaint. Plaintiffs state that on four occasions in October of 1996 Plaintiffs Marks met with
Isaac Tigrett, HOB's CEO, who continued to assure Plaintiff Marks that he was a valued
"partner" in HOB, and that HOB would soon be going public, thereby increasing the value of
Marks' investment. (Plaintiffs' Complaint ¶ 20).

At this time, Eric Levine allegedly represented to Plaintiff Marks that HOB was in the
process of "going public, "but that the underwriters insisted that prior to any initial public offering
("IPO") the Theatre Agreement had to be amended to delete any "put (sell back) provision that
required the General Partner, HOB Theatre, Inc., to repurchase Niki's equity interest in that
partnership. Levine then allegedly represented that Platinum Blues Chicago, the other limited
partner, would also give up its "put" right to facilitate the public offering and, that to show good
faith, John Marks also needed to demonstrate his willingness to work for the broader HOB
interests by also agreeing to that request. (Plaintiffs' Complaint ¶ 21).

Plaintiffs claim that they were fraudulently induced to sign the First Amendment to the

Partnership Agreement, and were told that "HOB was in the process of going public" (Complaint ¶ ¶19 & 21) and that under these fraudulent misrepresentation relinquished its "put."

Plaintiffs state that they relied on this false information to their detriment (Complaint ¶ 30), and that these material misrepresentations were know by the HOB Board to be false and made with the intent of having Plaintiffs rely upon these false misrepresentations (Complaint ¶ 31). Plaintiff points out that on March 16, 2000, HOB publicly announced that it had filed a Registration Statement with the Securities and Exchange Commission evidencing its intent to finally make an initial public offering of certain of its shares.

Plaintiff complains that in the fall of 1999 HOB sold equity securities which transferred voting control of HOB to Chase L.L.P. an unrelated third party, which but for the First Amendment, would have also permitted Marks Theatre Investments, L.L.C. to require the General Partner HOB Theatre, Inc. to purchase its limited partnership interest at the purchase price formula set forth in Article XII of the Theatre Agreement (Complaint ¶ 28).

Defendant Theatre General Partnership moves for summary judgment on Count I of Plaintiffs' complaint arguing that Plaintiff has failed to raise any issues of material fact with respect to Plaintiffs' alleged fraud in the inducement when signing the First Amendment to the Theatre Partnership Agreement. Defendant argues that Plaintiff cannot show any fraud in the inducement of the First Amendment because there was no false representation of an existing fact and not actual reliance on this alleged fact.

To prove fraud in the inducement, plaintiff must show that (1) defendants made a false representation of fact; (2) the false representation was made knowingly or with reckless indifference as to the truth; (3) defendants intended to induce plaintiff to act or refrain from

17

acting; (4) the plaintiff actually and reasonably relied on the representation in undertaking some conduct; and (5) plaintiff was injured as a result of its reliance on the misrepresentations. *Griffin v. Teledyne, Inc.* 611 A.2d 467 (Del. Supr. 1992) and *Biasotto v. Sprenn*, 1997 WL 527956, at *8 (Del. Super. Ct. 1997).

Plaintiffs claim that they have stated a claim for fraud in the inducement because HOB "failed to disclose" to Plaintiff Marks the dissension among board members and various deficiencies in the ...management of HOB. In particular, Plaintiff complains of the November 26, 1996 ousting of Isaac Tigrett, as Chief Executive Officer of HOB, by taking away his power, responsibilities, and control, without informing Marks. Plaintiff also alleges that HOB's November 26, 1996 Draft S-1 Disclosure statement contained information which was false on December 20, 1996, and that the HOB Board of Directors had a fiduciary duty to disclose all material information which they did not do.

As to the false misrepresentation of Tigrett's participation in HOB we find that Plaintiff has failed to raise a genuine issues of material fact as to HOB's fraudulent inducement. The undisputed facts reveal that despite the fact that many of Tigrett's duties were assigned to Gary Trojan, Tigrett was not voted out as Chairman of HOB until September 27, 1997–ten months after the First Amendment was executed by Plaintiff.

Marks claim that, "[I]f Tigrett lost control of HOB, the "put" provision allowed Marks to sell his interest to the {Theatre General partner} for a contractually stated amount. (Plaintiffs' Opposition Memo at 7). This argument is contradicted by the Theatre Limited Partnership Agreement. Under section 12.1 of the original, pre-amendment Theatre Limited Partnership Agreement, the only events that triggered the put were (1) a sale of all of HOB Entertainment's

assets, (2) an IPO, or (3) transactions which transferred voting control of the entire company, and not the removal of one of the Board members. Thus, even if Tigrett had been stripped of his CEO powers the put right would not have been triggered. In addition, while certainly the loss of Tigrett was a blow to HOB Entertainment it is undisputed that HOB Entertainment still had key players such as Gary Trojan and Dan Akroyd involved in the business venture. Finally, there is no case law cited by Plaintiff, whatsoever, which requires a corporate defendant to disclose dissension among its board members.

As to HOB's alleged material misrepresentations regarding HOB's future IPO we find it undisputed that HOB never guaranteed that an IPO would be completed by the end of 1997. To be sure statements as well as planning for a IPO were made, but such a representation cannot be concluded to be a misrepresentation of an existing fact. *Consolidated Fisheries Co. v. Consolidated Solubles Co.,* Del Supr., 112 A. 2d 30, 37 (Del. 1955). Indeed, under similar circumstances involving IPO's courts have held that such statements about the prospects for an IPO are nonactionable as a matter of law. For example, in *Donner v. Keefe, Bruyett & Woods, Inc.,* 157 F. Supp. 2d 265, 278 (S.D.N.Y. 2001), the court held that statements that an IPO was a 'done deal' and a "sure things" were non actionable as a matter of law because "[t]he fulfillment of plants for an IPO is never a certainty" and these sort of statements constitute nothing more than "speculative expression" of hopes for a future event.

Secondly, we agree with Defendants that there was no reliance by Marks on these alleged statements. It is undisputed that Marks had been waiting for the company to go public "as quickly as they could" since 1995 when he first sought to purchase HOB Entertainment stock and again in May of 1996 when he purchased $300,000 worth of the stock. Further, it is undisputed that

19

Mark's had knowledge of HOB's financial situation in general, and that HOB's likelihood of going forward with an IPO was speculative at best-- especially in November of 1996. Finally, it is undisputed that the December 19, 1996 letter from Cecil Schenker, HOB's attorney to Plaintiffs' counsel expressly reminded Plaintiff that "there can be no assurance that a public offering of the Common Stock of HOB Entertainment, Inc. will occur."

We also find Plaintiffs' alleged reliance on statements that an IPO would occur in the first quarter of 1997 is unreasonable as a matter of law to support a material misrepresentation of fact because Marks received documents specifically telling him that no such guarantee could be made. In general, courts have found that statements about the prospects for an IPO are nonactioanable as a matter of law. For example, in *Dooner v. Keefe, Bruyette & Woods, Inc.,* 175 F. Supp. 2d 265, 278 (S.D.N.Y. 2001), the court held that statements that an IPO was a "done deal" and a "sure thing" were nonactionable as a matter of law, because "[t]he fulfillment of plans for any IPO is never a certainty" and these sort of statement constitute nothing more than "speculative expression" of hopes for a future event. Statements about the prospect of an IPO are not representations of present material fact and reliance upon such statements is unreasonable as a matte of law because an IPO is an inherently uncertain event. The Seventh Circuit has routinely held that "a person who has received written disclosure of the truth may not claim to rely on contrary oral falsehood." *Rissman v. Rissman,* 213 F. 3d 381, 384 (7th Cir. 2000). It is undisputed that Plaintiff has offered no evidence that the IPO did not go forward because of Tigrett's removal.

Moreover, it is undisputed that Plaintiff did little of no research as to whether the IPO was in fact going to go forward. Finally, we find that Plaintiff was sent a draft of the Form S-1 SEC

filing, which contained a discussion of the business and financial condition of HOB Entertainment, including identifying losses from its operations at the Atlanta Club as well as substantial overruns during construction of the Theatre.

Plaintiff's allegation that the Theatre Limited Partnership misrepresented the material fact that Platinum would be relinquishing its "put" rights in the First Amendment to the Theatre Partnership Agreement is also insufficient as a matter of fact to support a fraud in the inducement claim. There is no doubt that this statement was made to Marks. However, it is undisputed that Marks was provided with several drafts of the of the proposed First Amendment which clearly disclosed that Section 12.1 shall only apply to Platinum and Marks hereby waive[d] and release[d] HOB of any and all rights it had under the Partnership Agreement to put its Limited Partnership Interest to the General Partner. This language is uncontroverted but yet Marks signed the First Amendment with the language providing in fact that only Marks would be relinquishing its "put" right. In light of this language it cannot be concluded that Marks was fraudulently induced into signing the First Amendment to Theatre Partnership Agreement. The Theatre Partnership Agreements as well as the Stock Purchase Agreement were multi-million dollar transactions negotiated at length by sophisticated parties represented by counsel. Further, Marks had the opportunity to discover information that would make reliance on the alleged misrepresentations unreasonable. The sophistication of Marks as a business man as well as the fact that he had ample access to information with respect to HOB Entertainment all prevent us from concluding that Marks was fraudulently induced into signing the First Amendment to the Theatre Partnership Agreement.

As to Plaintiffs' equitable fraud theory we find that this cause of action fails for the same

21

reasons set forth above. Because equitable fraud has the same requirements of misrepresentation of a present material fact and reliance, *see Zirn v. VLI Corp.*, 681 A. 2d 1050, 1061(Del. Supr 1996), this claims fails for the same reasons as the fraudulent inducement claim.

## COUNTS II & III

Count II of Plaintiffs' First Amended Complaint alleges a breach of contract by the General Partner, HOB Hotel, Inc. This claim is brought by Plaintiff Marks Hotel Investment, L.L.C. one of HOB Hotel Chicago Partners, L.P. two limited partners. Plaintiff alleges a derivative claim under Delaware law on behalf and in the right of the Limited Partnership HOB Hotel Chicago Partners, L.P. against the general partner HOB Hotel Chicago Partners, Inc. for breach of contract.

Plaintiff alleges that under the terms of Section 5.1 and 5.2 of the Hotel Partnership Agreement, the General Partner HOB Hotel, Inc., was vested with the exclusive power and general authority to manage and control the partnership business, subject to significant limitations contained in Section 5.7 and other provisions of the Agreement (Complaint ¶ 42). Plaintiff alleges at various times from and after entry into the Hotel Partnership Agreement, the General Partner HOB Hotel, Inc. was grossly negligent and breached its contractual duties to the partnership under the Agreement (Complaint ¶ 43). More specifically Plaintiffs' alleged breaches include the following:

> (i) Jeffrey Lapin, the general partner's Operating Manager, was absent from the Marina City Hotel and commercial development project ("Project") for unreasonable periods during the first year of the Partnership and otherwise unavailable such that the business of the Partnership was unreasonably impaired;
>
> (ii) Jeffrey Lapin terminated key advisors, failed to adequately pursue leasing prospects and hotel management prospects, and otherwise failed to promote the

22

business of the Partnership;

(iii) Jeff Lapin engaged in a pattern of business disparagement against John Marks and this affiliates to the detriment of the Partnership;

(iv) HOB failed to adequately supervised Jeff Lapin, failed to obtain written reporting from Jeff Lapin and otherwise permitted Jeff Lapin to perform the duties of HOB Hotel, Inc. as General Partner in a manner detrimental to the best interests if the Partnership and contrary to reasonably prudent business practices.

(Plaintiffs' Complaint ¶ 43(A)).

Plaintiff Marks Hotel Investment, LLC further alleges that HOB Hotel Chicago Partner, Inc. violated sections 5.4(a), (c) and 5.9 of the Hotel Partnership Agreement when it failed to account for all dealings and transactions relating to the Partnership and failed to timely prepare budgets and other financial statements and in general failed to exercise ordinary prudence. (Complaint ¶43(B), (C)and (D)) in violation of Section 7.2 of the Partnership Agreement (Complaint ¶ 43(E).

Count III sets forth a claim for breach of fiduciary duties of the General Partner, HOB Hotel, Chicago Partners Inc. to Plaintiff Marks Hotel, L.L.C.–one of the two limited partners. Plaintiff alleges that Defendant HOB Hotel Chicago Partner, Inc. participated in, authorized, and caused the acts complained of in paragraph 43 of the complaint as well as in Count II of the complaint and breached of its fiduciary duty of due care to the limited partners.

Before moving to the substance of Plaintiffs' arguments we must note that many of Plaintiffs' claims have a statute of limitations problem. Delaware law provides that claims for breach of fiduciary duty and breach of contract have a three year statute of limitations. *See* Del. Code. tit. 10, § 8106. Absent self dealing, concealment or fraud, a cause of action accrues at the

moment of the wrongful act. *See In re MAXXAM, Inc./Federated Dev. Shareholders Litig.,* 1995 WL 376942, at \*5. (Del.Ch., June 21, 1995); *David B. Lilly Co., v. Fisher,* 18 F. 3d 1112, 1117 (3d. Cir. 1994) and *Bokat v. Getty Oil Co.,* 262 A. 2d 246 (1970).[1]

In the instant case it is undisputed that many of Plaintiffs' claims for breach of contract and breach of fiduciary duties revolve around facts which took place during the years 1996 and 1997 when the initial construction of the Theatre and the Hotel were commenced. The copies of the initial budgets, project time lines and other documents Marks relies on as a basis for the alleged breaches are from 1996. It is also undisputed that Marks was aware of these alleged breaches of contract which took place during the construction of the Hotel and Theatre because he complained time and time again about the management of the project. Hence, any acts complained of by Plaintiffs which occurred prior to June of 1997 are time barred.

As to Mark's timely claims we find that these claims are insufficient as a matter of law to support Mark's alleged breach of contract and breach of fiduciary duties claims against the Hotel General Partner. As to Plaintiffs breach of contract claims we find that Plaintiff's argument that Section 5.1 and 5.2 of the Hotel Partnership Agreement vested the General Partner with the exclusive power and general authority to manage and control the partnership business is insufficient as a matter of fact to support the breach of contract action alleged by Plaintiff.

It is undisputed that the purpose of the HOB Hotel Chicago Partners, LP was "to acquire and **own a membership interest** in the Operating Company which was formed to develop a House of Blues themed hotel and shopping center in Chicago, Illinois (Plaintiffs' Exhibit C, page

---

[1]Many of Plaintiffs' additional facts found in Plaintiffs' Additional Statement of Facts, ##205-307 deal with time barred acts of Lapin's. They also discuss the day to day running of the development.

5, section 2.5). Thus, the General Partner under Sections 5.1 and 5.2 of the Hotel Partnership agreement had exclusive power as to its membership interest in the Operating Company MCHE. This does not equate to exclusive power and authority over the development of the Hotel as a whole, nor does it support a breach of the partnership contract. Plaintiff has set forth no facts as to how the General Partner breached the contract as to the membership interest in MCHE. Rather, Plaintiff Marks Hotel Investment LLC argues it may proceed against the General Partner HOB Hotel, Inc. because the General Partner controlled the construction of the Hotel.

While the undisputed facts support the conclusion that the General Partner controlled the hotel development to a great extent the undisputed facts also reveal that Nomura participated in the control of the hotel development. This is in accord with the terms set forth in the Operating Agreement which was in incorporated in the Hotel Partnership Agreement.

It is undisputed that Section 5.1 of the Operating Agreement, entitled "Selection of Managers," granted the Hotel General Partnership the right to appoint one of the "two Managers" of Marina City Hotel Enterprises ("MCHE"), and the right to remove its appointee. Section 5.2, entitled "Powers and Duties of Managers," provides for the appointment of an Operating Manager, which has "responsibility for, and authority over, the day-to day management and operation of the Company and the ordinary conduct of business of the Managers." (Operating Agreement Section 5.2.2) .

It is also undisputed that the General Hotel Partner appointed Lapin as the Operating Manager, and that Nomura's managers David Murdoch and Rob Trelevan were involved as managers pursuant to section 5.1 the Operating Agreement. It is undisputed that the Hotel General Partner was not contractually responsible for the decisions at issue. The MCHE Operating

25

Agreement vests management of the hotel, retail space and parking garage in a two person board of managers; one is appointed by Nomura, the other by the Hotel Limited Partnership. The Operating Agreement vests exclusive authority in Nomura to make all decisions regarding various aspects of the project, including budgets, construction schedules, selection of a hotel manager, and leases of more than 5,000 square feet. Section 2.3 of the Operating Agreement, reveals that the Hotel General Partnership was not given the right to act as the developer, that power was reserved to MCHE, whose very existence was to act as developer. Section 5.3.1 of the Operating Agreement delegates these decisions exclusively to Nomura ("NACC Delegated Decisions"), and provide Nomura with the power to make these decision without approval from the Hotel General Partner.

The many documents produced by Plaintiff reveal that House of Blues Hospitality (one of limited partners and employer of Lapin), Nomura and MCHE were extensively involved in all aspects of the development of the Hotel. Weekly project reviews were copied to Lapin as well as Murdoch. (Plaintiffs' Exhibit 74). Technomic Group, a food industry consulting group, sent its proposed contract to both House of Blues Hospitality (Jeff Lapin) and Nomura (Trelevan) for approval. (Plaintiffs' Exhibit 51). The budget as well as the draw requests were forwarded to both Lapin and Trelevan). (Plaintiffs' Exhibit 52). The time line for the project was copied to Nomura by Lapin. (Plaintiffs' Exhibit 54). Conference memorandum by VOA were always copied to Lapin and Trevelan. (Plaintiffs' Exhibit 70). The Landauer Hospitality Group forwarded its market analysis for the 350 room hotel project to both Lapin and Trevelan. (Plaintiffs' Exhibit 58). David Murdoch (Nomura) and Lapin were copied on MCHE's minutes as to the status of development project. (Plaintiffs' Exhibit 74). Furthermore, the Nomura manger, David Murdoch

appeared to have the exclusive right to make many of the complained of decisions pursuant to sections 5.3.1(c)(d)(e) and (n) of the Operating Agreement

In fact, Plaintiff acknowledges participation by MCHE and Nomura when he criticizes MCHE's decision to consider alternative designs for the Hotel, the decision not to lease to Carluccis or Sambuca or even as to the performance of the hotel and in Count IV he states that it was not until Nomura complained about Lapin that Lapin was removed as Operating Manager. Hence, there is no evidence in the record that MCHE or Nomura were simply shells of the Hotel General Partnership and that the Hotel General Partnership was the party in fact responsible for the alleged breaches of contract. Moreover, in light of the substantial financial stake Nomura had in the project it is unlikely that Nomura would not participate in the management of the project. Finally, it is also undisputed that Marks Hotel has sued MCHE in the Circuit Court of Cook County for similar alleged breaches of contract.

As to application of the business judgment rule we find that Defendant General Partner HOB Hotel's has raised sufficient facts to support its application. The business judgment rule is a presumption that in making a business decisions the directors of a corporation "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Smith v. Van Gorkom*, 488 A. 2d 858. 872 (Del. 1985). The presumption, however, attaches only to the decisions of directors who are fully independent and wholly disinterested. When the business judgment rule applies, it insulates directors from liability, and imposes upon the party challenging the decision the burden of rebutting the presumption. *Id.* "A hallmark of the business judgment rule is that a court will not substitute its judgment for that of a board if the latter's decision can be attributed to any rational business purpose." *Unocal Corp. v.*

*Mesa Petroleum Co.,* 493 A. 2d 946, 954 (Del. 1985).

As to Plaintiff's allegations that Jeffrey Lapin was absent from the project we take these allegations as true but this does not equate with the Hotel General Partner breaching the contract nor does it dissolve the presumption of the business judgement rule. There is little evidence produced by Plaintiff as Lapin's termination of key advisors. The leasing issues and cost overruns that Plaintiff's complain of could in some instances constitute a breach of contract but he has not produced admissible evidence to support the conclusion the General Partner was grossly negligent. It is undisputed that Operating Agreement contemplated the possibility of cost overruns. (Defendants' Exhibit 2, § 1.1.37 p. 37). Plaintiff also raises facts concerning MCHE's decision to wait to sign the lease with the Smith & Wollensky steakhouse chain until Nomura had committed to financing the project (Plaintiffs 56.1 Statement ¶¶ 322-34). Yet Plaintiff admits that the signing of the lease sooner would have committed MCHE to fund more than $2 million in tenant improvements (Response to Statement ¶ 110), before Nomura was fully committed to funding the project. It is undisputed that because Nomura had not yet committed to funding the project it instructed Lapin to not sign the lease or any other least until Nomura had made a decision on funding. Likewise, MCHE's decision to consider alternative designs represents a classic business judgment which is its prerogative under the relevant agreements. *See Opus Corp. v. International Bus. Mach. Corp.,* 141 F. 3d 1261,1269 (8th Cir. 1998).

The most that Delaware law requires of directors, though they are fiduciaries, is that the not be grossly negligent. 1 David A. Drexler et al., *Delaware Corporation Law & Practice §* 15.06[1], at 15-35 (citing *Brehm v. Eisner,* 746 A. 2d 244, 262 (Del. 2000) and *Aronson v. Lewis,* 473 A. 2d 805, 812 (Del. 1984). Plaintiff has not established gross negligence on the part of the

Hotel General Partner. Rather, Plaintiff has asked the Court to second guess many of the decisions made by Lapin. Moreover, Plaintiff has failed to produce any evidence of bad faith, dishonest motive, self-dealing, or conflict of interest which would support a breach of fiduciary duty claim. Because Plaintiff has failed to state a claim for breach of contract and/or breach of any fiduciary duties against the Hotel General Partner summary judgment is granted in favor of the Defendant HOB Hotel Chicago Partner, Inc.

## COUNT IV

Count IV of Plaintiffs' complaint sets forth a claim for breach of fiduciary duty by HOB Entertainment, Inc., and relates exclusively to the interests of Mark Hotel, a limited partner in the Hotel Limited Partnership (Complaint ¶ 54). Count IV is a derivative claim against HOB for breach of its fiduciary duty of care on behalf and in the right of the limited partnership, HOB Hotel L.P. based upon HOB's control over the General Partner, HOB Hotel, Inc.

Plaintiff alleges that in discussions leading to the proposed structure of the Hotel Partnership Agreement in which HOB Hotel, Inc. would be the General Partner, HOB representatives expressed concerns about Marks' relationship with Nomura, and Marks expressed concerns about the safety of his proposed investment as a limited partner through MHI. (Complaint ¶ 56). Plaintiff alleges that HOB's delegate Mr. Levine assured Marks in a personal meeting in late 1996 that he had spoken to HOB board representatives and that HOB would continually monitor and protect Marks' interest in the partnership if Marks became a limited partner, rather than a member of the limited liability company that would operate the Hotel. (Id.) Plaintiff claims that in direct reliance on these representations Marks caused MHI to subsequently become a limited partner in the HOB Hotel limited partnership. (Complaint ¶ 56).

29

Plaintiff claims that HOB had authority and effective control over the General Partner, HOB Hotel, Inc. though its majority directors (Complaint ¶ 57) and that by virtue of this control position, HOB and its directors have fiduciary duties of loyalty and due care to the limited partners (Complaint ¶ 58). Once again, Plaintiff complains about Lapin's mismanagement and claims that he was given assurances that HOB would in good faith investigate Lapin's conduct to assure the proper running of the project (Complaint ¶ 58).

Plaintiff alleges that even Nomura, as a member of the Hotel , LLC recognized HOB as the control entity or real party in interest in managing the HOB Hotel General Partner. In particular, by letter dated June 6, 2000 to HOB, Nomura through its Partnership Acquisition Trust VIII requested HOB to appoint a new operating manager of the Hotel to manage the hotel (Complaint 61).

To hold a parent corporation such as HOB Entertainment liable for breaches of the General Partner's fiduciary duties Plaintiff must raise sufficient issue of material fact to support the conclusion that HOB Entertainment personally participated in the wrongs complained of and utilized partnership assets under their control to enrich themselves at the expense of the Limited Partners. *See Wallace v. Wood*, 752 A. 2d 1175, 1181-82 (Del. Ch. 1999). In this case it is undisputed that the record contains sufficient facts to support Plaintiffs' allegations that HOB Entertainment exercised control over Lapin, the Hotel General Partner, as well as the project itself. However, the degree of control established in the record is insufficient to establish liability under *Wallace v. Wood.*

Plaintiff, Marks Hotel, has failed to establish sufficient facts to establish that HOB Entertainment's control dominated the Hotel Partnership or that HOB Entertainment benefitted

30

itself at the expense of Marks Hotel. In fact, even in the allegations of Count IV Plaintiff, Marks Hotel, points out that it was not until Nomura contacted HOB Entertainment that Lapin was removed as Operating Manager. As explained *In re USA Cafes*, directors of the General Partner can only be found to have breached fiduciary duties to the limited partners if the directors were alleged to have "personally participated in the alleged breach of the General Partner itself" in such a way as to have enriched themselves. 600 A. 2d 41, 48 (Del. Ch.1999). And more recently, in *Gotham Partners, L.P. v. Hallwood Realty Partners, LP* 795 A. 2d 1,34 (Del. Ch. Ct. 2001), the Court reiterated that *USA Cafes* and *Wallace* had established that directors and corporate parents of general partners could only be "subject to [fiduciary] liability for implementing unfair, self-dealing transactions;" in other words, for participating in alleged fiduciary breaches in which they themselves benefit.

We agree with Defendant HOB Entertainment that its ownership of the hotel General Partners' stock as well as the stock in HOB Hospitality does not automatically make HOB Entertainment liable for the acts of its subsidiary. To be sure this ownership of stock supports Plaintiffs' argument that HOB Entertainment controlled its division HOB Hospitality as well as the Hotel General Partner but it does not establish the complete domination or self dealing as required by the case law. Furthermore, the fact that HOB Entertainment investigated Plaintiffs' complaints regarding the alleged mismanagement does not change this outcome. Delaware courts have consistently held that a corporate parent cannot be held liable for the acts of its subsidiary unless it can be shown that the corporate partner both exercised control and used that control to benefit itself wrongfully in some fashion. *Wallace v. Wood,* 752 A. 2d at 1182. Therefore summary judgment is entered in Defendant HOB Entertainment's favor.

31

## CONCLUSION

For the reasons set forth above Defendants HOB Hotel Chicago Partners, L.P., HOB Marina City Partners, L.P., HOB Hotel Chicago, Inc., and HOB Marina City Inc.'s motion for summary judgment is granted and Defendant HOB Entertainment Inc.'s motion for summary judgment is granted [Doc. ## 80-1, 81-1]. This case is hereby terminated. This is a final and appealable order.

**So Ordered.**                                       **Entered:** 3/28/03

Ronald A. Guzman
United States Judge

32